CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA.
FILED

NOV 3 0 2006

JOHN F. CORCORAN, CLERK
BY
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

**NANCY D. MEADE,**       )   Civil Action No. 2:06cv00008
                            )
       Plaintiff,         )
                            )   **MEMORANDUM OPINION**
v.                        )
                            )
**JO ANNE B. BARNHART,**    )   By: GLEN M. WILLIAMS
**Commissioner of Social Security,**  )   SENIOR UNITED STATES DISTRICT JUDGE
                            )
       Defendant.      )

In this social security case, this court vacates the final decision of the Commissioner denying benefits and remands the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

Plaintiff, Nancy D. Meade, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). This court has jurisdiction in this case pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Meade filed her applications for DIB and SSI on or about November 5, 2003, alleging disability as of May 30, 2003, based on diabetes, depression and chronic pain in her lower back, knees and feet. (Record ("R.") at 57–59, 65 , 272–75.) Her claims were denied initially and upon reconsideration. (R. 42–44, 45, 49–51, 278–80, 282–84.) Meade then requested a hearing before an administrative law judge, ("ALJ"). (R. at 52.) The ALJ held a hearing on July 12, 2005, at which Meade was represented by counsel. (R. at 22–39.)

By decision dated August 30, 2005, the ALJ denied Meade's claims. (R. at 13–17.) The ALJ found that Meade met the disability insured status requirements of the Act for DIB purposes through the date of his decision. (R. at 16.) The ALJ determined that Meade had not engaged in substantial gainful activity since May 30, 2003, the alleged onset of disability. (R. at 16.) The ALJ also concluded that the medical evidence established that Meade suffered from severe impairments, namely noninsulin dependent diabetes mellitus, obesity and mild degenerative changes in her knees, but he found that Meade did not have an impairment or combination of

-2-

impairments that met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16.) The ALJ determined that Meade's allegations regarding her disabling pain and other symptoms were not credible and were not supported by the documentary evidence. (R. at 16.) The ALJ found that Meade had the residual functional capacity to perform light work.[1] (R. at 15–16.) Therefore, the ALJ found that Meade could perform her past relevant work as an assembler and a sewing machine operator. (R. at 16.) Thus, the ALJ concluded that Meade was not under a disability as defined in the Act and that shew was not eligible for benefits. (R. at 16–17.) *See* 20 C.F.R. §§ 404.1520(e), 416.920(e) (2006).

After the ALJ issued his decision, Meade pursued her administrative appeals, (R. at 8.), but the Appeals Council denied her request for review on December 2, 2005. (R. at 5–7.) Meade then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Meade's motion for summary judgment or, in the alternative, for vacation of the Commissioner's decision and remand filed June 1, 2006, and on the Commissioner's motion for summary judgment filed June 28, 2006.

## II. Facts

Meade was born in 1953, (R. at 57, 272.), and she has a seventh-grade

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds; if someone can do light work, she can also do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

education.[2] (R. at 72.) She has past work experience as an assembly line worker, a coal miner and a sewing machine operator. (R. at 25–26, 66, 74.) She has also been employed to perform general cleaning and has worked at restaurants cooking, cleaning and tending a salad bar. (R. at 74.) At her hearing on July 12, 2005, Meade testified that she was approximately five feet one inch tall and weighed 251 pounds. (R. at 31.)

Meade also testified before the ALJ that she had not worked since May 30, 2003. (R. at 35.) Meade stated that she was most recently employed at Bristol Compressors, where she worked on an assembly line assembling compressors and pumps. (R. at 25–26.) She recounted that there was no lifting involved in this job and that she remained seated while at work. (R. at 25.) However, Meade indicated that this job no longer existed as it was being eliminated at the time she was working for Bristol Compressors. (R. at 36.)

Meade stated that she left her job because she became ill with kidney infections and pain that required her to visit the doctor frequently. (R. at 26, 36.) She also testified that her boss was not satisfied with her job performance because she was unable to concentrate or comprehend things as a result of her medical problems. (R. at 36.) When questioned by the ALJ about her ability to return to any kind of work, Meade responded that she could not. (R. at 36.)

Meade testified that she had noninsulin dependant diabetes. (R. at 27.) She

---

[2] Meade's disability report, prepared by a social security field office in connection with her original application for DIB and SSI, indicates that the highest grade she completed was seventh. (R. at 72.) However, Meade's testimony before the ALJ on July 12, 2005, indicated that she completed the eighth grade. (R. at 25.)

Case 2:06-cv-00008-GMW-PMS   Document 15   Filed 11/30/06   Page 4 of 32   Pageid#: 80

stated that although she took medication to control her blood sugar, it continued to fluctuate. (R. at 27.) Meade testified that she suffered from diabetic neuropathy which caused numbness and tingling in her legs. (R. at 27–28.) She stated that she had difficulty walking due to the pain, numbness and tingling in her legs. (R. at 28.) Meade also indicated that she had knee problems as a result of osteoarthritis and osteoporosis. (R. at 28.) She estimated that she could walk for about 20 minutes at a time with the assistance of a cane, but would have to rest for at least an hour thereafter. (R. at 29, 32.) Additionally, Meade testified that if she had to walk for longer than 20 minutes, she had to use a wheelchair. (R. at 29.) When the ALJ noted that Meade did not have her cane with her at her hearing, she stated that it was in her car. (R. at 33.)

Meade also testified that she was unable to drive a car for more than 5 or 10 miles due to a lack of concentration and knee pain. (R. at 30, 34.) Meade indicated that she has problems with concentration and that she had complained of anxiety and depression. (R. at 29.) However, the ALJ stated that the tests Meade was given by Robert Spangler, Ed.D, a licensed psychologist, and Kathy Miller, M.Ed., a licensed psychological examiner, did not indicate any limitations based on her anxiety or depression. (R. at 29.) Meade stated that she felt like these problems resulted in limitations. (R. at 30.) She also indicated that her ability to read "all the time," as she had in the past, was diminished because of her concentration problems. (R. at 30.)

Additionally, Meade testified that she had trouble sitting for more than 20 to 30 minutes because of pain in her back and knees. (R. at 32–33.) As a result of her pain, Meade stated that she was on Darvocet, but she tried not to take these pills too often. (R. at 33.) Meade insisted that she was in constant pain, but when questioned

by the ALJ, she stated that she was unsure if the pain she experienced was impacting her concentration as much as any other contributing factor. (R. at 34.)

Meade testified that she was able to get up and go to the bathroom. (R. at 32.) However, because of her medications and her diabetes, she testified that she had to use the bathroom an average eight to ten times a day. (R. at 32.) Despite her pain and other troubles, Meade testified that she was still able to live alone. (R. at 35.) She stated that she was able to cook relatively simple things for herself and go grocery shopping with the help of her grandson. (R. at 29, 35.) Meade stated that she attended church weekly. (R. at 31.) She stated that she was also able to get help from her daughter, who would come once a week to help her with cleaning and laundry. (R. at 35.) Meade also explained that she stayed with her sister when she was not feeling well or did not feel like being alone. (R. at 35.)

Cathy Sanders, a vocational expert, also was present and testified at Meade's hearing. (R. at 37–39.) Sanders testified that Meade's prior work as an assembler was sedentary[3] and semiskilled and that her work as a sewing machine operator was light and semiskilled. (R. at 37.) The ALJ asked Sanders a series of hypothetical questions about a person's work prospects based on the assumption that the hypothetical individual was of Meade's age, education and work background. (R. at 37.) The ALJ stipulated that the hypothetical individual also had a residual functional capacity for light work activity, but also had some emotional disorders that restricted her ability to work, consistent with the findings contained in Spangler's report. (R.

---

[3] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2006).

Case 2:06-cv-00008-GMW-PMS   Document 15   Filed 11/30/06   Page 6 of 32   Pageid#: 82

at 37.)  Sanders testified that there was a significant number of jobs existing in the regional and national economies that such a hypothetical person could perform, including a salad preparation worker, a hand packager, an assembler, an office assistant, a parking lot attendant, a shipping and receiving clerk and a ticket clerk. (R. at 37–38.)  Sanders stated that she would eliminate jobs that were higher stress from her list, to accommodate Spangler's observations.  (R. at 37.)

Sanders next testified that if the claimant had the residual functional capacity that was described in the report prepared by Dr. Samina Yousuf, M.D., Meade's primary treating physician, the hypothetical person could not perform the jobs previously mentioned, or any other job.  (R. at 38.)  Finally, Sanders was asked by the ALJ to speculate about Meade's ability to perform the aforementioned types of work if she accepted Meade's testimony about her limited mobility, problems sitting for any length of time and frequent need to use the restroom.  (R. at 39.)  Sanders concluded that, if true, these conditions would impinge on a full day's work activity in a competitive workforce.  (R. at 39.)

In rendering his decision the ALJ reviewed records from Dr. Samina Yousuf. M.D.; Dr. Neal Jewell, M.D.; Dr. Felix Shepard, Jr., M.D.; William Haynes, M.Ed.; Kathy J. Miller, M.Ed.; Robert Spangler, Ed.D.; Highlands Spine Institute;  Russell County Medical Center, ("RCMC");  Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Robert O. McGuffin, M.D., a state agency physician; R.J. Milan, Jr., Ph.D., a state agency psychologist; and Howard Leizer, Ph.D., a state agency psychologist.

*A. Physical Health History*

Meade presented to the emergency department at the RCMC, on September 3, 2002, complaining of lower back pain and pain in her left leg and calf. (R. at 120–21.) She indicated that she had fallen a month to six weeks prior and injured her back. (R. at 120.) Meade also indicated that she had injured her back a couple of years earlier causing her to miss two days of work. (R. at 120.) X-rays of Meade's left knee showed mild degenerative changes, but no acute fracture or acute bony abnormality. (R. at 122.) X-rays of Meade's sacrum showed no acute fracture or acute bony abnormality. (R. at 122.) Likewise, the x-rays of Meade's lumbar spine showed no acute fracture. (R. at 122.) The spinal x-rays indicated that her pedicles were intact, her disc spaces were well preserved and there was no compression fracture. (R. at 122.) No significant changes were noted since her previous exam on October 21, 2001. (R. at 122.) Meade was diagnosed with exacerbation of chronic back pain. (R. at 121.)

On December 30, 2002, Meade returned to the RCMC emergency room tearful and complaining of depression, concerns about her recent diabetes diagnosis, a rash under her breasts and pain in her left leg. (R. at 118–19.) Meade was diagnosed with depression, intertrigo[4] and a contusion. (R. at 119.) She was prescribed Paxil. (R. at 119.)

Meade was again seen at the RCMC emergency room on April 10, 2003, and June 1, 2003, complaining of pain, dysuria, hematuria and frequency. (R. at 123–26.)

---

[4] Intertrigo is a superficial dermatitis occurring on apposed skin surfaces. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("DORLAND'S"), 847 (27th ed. 1988).

Case 2:06-cv-00008-GMW-PMS    Document 15    Filed 11/30/06    Page 8 of 32    Pageid#: 84

Meade was diagnosed with, and treated for, recurring urinary tract infections.  (R. at 123–26.)

On August 5, 2003, Meade presented to the RCMC emergency room complaining of intermittent pain of the right anterior chest exacerbated by movement and associated with shortness of breath and increased stress and anxiety.  (R. at 208–09.)  Meade was diagnosed with costochondritis.[5]  (R. at 209.)

On June 6, 2003, Meade was referred to the Appalachian Urology Center for her complaints of frequency, urgency and incontinence. (R. at 141–142.)  She was diagnosed, by Dr. Felix E. Shepard Jr., M.D., with mixed incontinence, atrophic vaginitis, hypertonic bladder and vaginitis.  (R. at 142.)  She was treated with medications.  (R. at 142.)

Meade saw Dr. Samina Yousuf, M.D., her treating physician, from June 16, 2003, to May 11, 2005. (R. at 145–207, 258–71.)  On June 16, 2003, Meade saw Dr. Yousuf at Community Medical Care, ("CMC"), for multiple medical problems, including severe problems with swelling and pain in her right knee.  (R. at 194.)  Dr. Yousuf reported that Meade had severe tenderness to palpation along her thoracic and lumbar sacral spine.  (R. at 194.)  Dr. Yousuf also noted trace pitting edema in her lower extremities, moderate crepitus in both knees, moderate to severe arthritis and minimal joint effusion in her right knee and severe tenderness to palpation in her right knee.  (R. at 194.)  Meade's motor strength was 4/5 in her right lower extremity, but

---

[5] Costochondritis is an inflamation at the junction of the ribs and cartilage that can create radiating pain in the anterior chest wall.  *See* STEDMAN'S MEDICAL DICTIONARY, ("STEDMAN'S"), 403 (26th ed. 1995).

it was otherwise 5/5. (R. at 194.) Dr. Yousuf found her to be quite depressed and unable to concentrate. (R. at 194–95.) Dr. Yousuf diagnosed Meade with type II noninsulin dependent diabetes mellitus, osteoarthritis in the right knee, chronic low back pain, history of vertebral compression, fatigue, dyslipidemia, depression and obesity. (R. at 194.) Meade underwent a joint injection in the right knee. (R. at 196.)

On June 23, 2003, a bone density study showed that Meade had a moderate to marked increased risk for fracture when compared to an age and sex matched population. (R. at 204–05.)

On July 15, 2003, Meade complained of multiple problems, including continued pain and swelling in her right knee and foot, as well as increased lower back pain. (R. at 191–93.) Dr. Yousuf stated that Meade looked depressed and became tearful during the examination. (R. at 191). She also reported that Meade's depression was still rather acute and seemed uncontrolled despite the fact that she had begun to see a therapist. (R. at 191.) Meade's blood sugar readings were satisfactory, but she had 1+ pitting edema in her bilateral lower extremities. (R. at 191.) Dr. Yousuf also documented continued troubles with Meade's right knee including severe crepitus, moderate joint effusion and tenderness to palpation in the lateral and medial aspects. (R. at 191.) However, Meade's motor strength remained intact. (R. at 191.) Meade was diagnosed with osteoarthritis in her right knee, type II noninsulin dependent diabetes mellitus, depression, anxiety disorder and lower extremity edema. (R. at 191.)

Again, on August 11, 2003, Meade saw Dr. Yousuf with multiple problems, including the inability to stand for more than one-half hour, very swollen legs and

-10-

pain in her legs. (R. at 189–90.) Dr. Yousuf noted evidence of fairly severe osteoporosis and osteoarthritis in both of Meade's knees, with the right worse than the left. (R. at 189.) She had 2+ pitting edema in her lower extremities and continued to have moderate tenderness to palpation and effusion in her knees. (R. at 189.) In addition, Meade noted that she was experiencing problems with urgency and frequency after she stopped taking Macrobid. (R. at 189.) However, she reported that she had recently restarted her medication. (R. at 189.) Dr. Yousuf again noted that Meade was quite depressed and cried during her examination. (R. at 189.) Dr. Yousuf repeated her diagnoses from July 15, 2003, except that she expanded her diagnosis of osteoarthritis to both knees, not just the right knee. (R. at 189.)

Meade reported on August 12, 2003, that her nerves were bothering her quite badly and that she was having difficulty controlling the amount she was eating. (R. at 188.) Meade stated that she felt that she had an eating disorder and requested help with dieting. (R. at 188.)

On October 14, 2003, Meade complained of problems with her "nerves," back pain, leg pain and joint pain. (R. at 181–84.) Dr. Yousuf reported that Meade's depression was controlled with medication, but Meade also was complaining of confusion, anxiety and memory loss for recent information. (R. at 181.) Examination revealed full range of motion of the back and all extremities. (R. at 183.) Dr. Yousuf reported that Meade was confused, apprehensive and anxious. (R. at 184.) Dr. Yousuf reaffirmed her diagnoses of type II diabetes mellitus and osteoarthrosis in the lower legs. (R. at 184.) She also diagnosed Meade with aggravated depressive disorder, chronic generalized anxiety disorder and chronic hypertension. (R. at 184.) Dr. Yousuf opined that Meade was unable to drive and work due to severe depression

-11-

and numerous medical problems. (R. at 184.)

On November 11, 2003, January 8, 2004, May 4, 2004, October 1, 2004, and November 4, 2004, Dr. Yousuf and others at CMC noted the same recurring symptoms reported by Meade. (R. at 145–59, 167–80.) These symptoms included depression, crying, anxiety, tiredness, weakness, joint pain, back pain, knee pain, memory loss for recent places and names, depression, uncontrolled by her current medicine, and obesity. (R. at 145–59, 167–80.) Dr. Yousuf noted that Meade's back had no abnormal curvatures, full range of motion and no point tenderness. (R. at 151, 157, 170, 178.) Dr. Yousuf also noted inflamed and swollen knees, crepitations in Meade's knees and ankle/foot +1 pitting edema. (R. at 151, 157, 171, 178.) Meade's diagnoses, including type II diabetes mellitus, osteoarthritis in the lower legs, depressive disorder, anxiety disorder and obesity, remained basically the same through all of these examinations; however, the opinion that Meade was unable to drive or work was not repeated after the October 14, 2003, examination. (R. at 151, 157–58, 171, 179.)

On May 4, 2004, Meade was seen at CMC by Tonia Mitchell, FNP, and she reported the same symptoms as reported by Dr. Yousuf. (R. at 159–66.) Mitchell recommended weight loss and a return visit. (R. at 165.) On November 11, 2003, Dr. Yousuf recommended physical therapy for Meade; however, it is unclear if physical therapy was ever undertaken. (R. at 179.)

Additionally, on October 1, 2004, Meade first complained of tingling, burning and numbness in her hands. (R. at 155.) By November 4, 2004, Meade was reporting the burning, tingling and numbness was in both her hands and feet. (R. at 149.) The

-12-

symptoms of tingling, burning and numbness in her hands and feet persisted through her appointments with Dr. Yousuf on January 6, 2005, and March 3, 2005. (R. at 261–62, 266.) Dr. Yousuf noted decreased vibratory sensation in Meade's lower extremities. (R. at 151, 264, 268–69.) Meade was diagnosed with peripheral neuropathy. (R. at 264.)

Also noted at Meade's November 4, 2004, appointment were complaints of pain in her left hip along with her continual knee and back pain. (R. at 151.) This pain continued and was again documented with her other continuing ailments on January 6, 2005, and March 3, 2005. (R. at 260–64, 265–69.)

Dr. Yousuf completed a form indicating Meade's ability to work November 4, 2004. (R. at 206–07, 258–59.) She diagnosed Meade with diabetic neuropathy and osteoarthritis of both knees, along with an anxiety disorder with depression. (R. at 206–07, 258–59.) Dr. Yousuf highlighted Meade's many physical ailments including her back pain, knee pain and left hip pain. (R. at 206–07, 258–59.) She noted the swelling in both of Meade's knees, crepitation and the loss of vibratory sensation in her lower extremities. (R. at 206–07, 258–59.) Finally, Dr. Yousuf noted Meade's burning and tingling sensations in both feet. (R. at 206–07, 258–59.) Dr. Yousuf also indicated that Meade used a knee brace and a cane to aid in walking. (R. at 206–07, 258–59.) Meade's pain was described as constant and lasting at least four to six hours a day, which interfered with her concentration, making her forgetful and causing confusion. (R. at 206, 258.) Dr. Yousuf also indicated that Meade had psychological problems for which she was receiving treatment. (R. at 206–07, 258–59.)

Dr. Yousuf opined that Meade would need to work a job that allowed her to shift positions from sitting, standing or walking every half-hour. (R. at 206, 258.) Additionally, Dr. Yousuf opined that Meade would need to take unscheduled breaks every hour and would need to rest 15 to 20 minutes before returning to work. (R. at 206, 258.) Dr. Yousuf estimated that Meade would be absent from work more than three times per month due to complications from her impairments. (R. at 206, 258.) Dr. Yousuf also noted that Meade was unable to stand for more than one-half an hour at a time and could not work around moving machinery. (R. at 207, 259.) She also stated that Meade could not walk for more than 10 to 15 minutes because of her bilateral foot pain. (R. at 207, 259.)

Meade was referred to Brian Buxton, a physician's assistant at Appalachian Orthopaedic Associates, P.C., on September 16, 2003, for recurring knee and back pain. (R. at 188, 215–17.) At this appointment, Meade stated that her pain had started in May of 2003 in her right knee. (R. at 215.) Buxton noted that no specific trauma initiated that pain. (R. at 215.) The pain was described as being worse in wet weather and would become acute depending on the position of Meade's leg. (R. at 215.) Buxton also noted that Meade described that she would experience appreciable edema daily, but it would resolve overnight. (R. at 215.) Meade indicated that although physical therapy, Naprosyn and injections had provided positive results in the past, the pain would eventually return. (R. at 215.) In general, the pain and symptoms described to Buxton were the same as those described to Dr. Yousuf. (R. at 215.) However, Buxton noted that Meade reported to have lost 40 pounds in the three to four months prior to his examination, but that she was still morbidly obese at 235 pounds and five feet one inch tall. (R. at 216.)

-14-

Buxton performed a full examination of Meade's legs, noting that she had a full range of motion in both knees. (R. at 216.) However, he noted marked discomfort with the maneuvers on the right knee as well as joint line tenderness along both medial and lateral aspects of the right knee. (R. at 216.) He also noted patellofemoral crepitation and a rather large Baker's cyst[6] on the right knee. (R. at 216.)

X-rays of Meade's knees showed some mild degenerative joint disease in both knees, mild osteophyte formation bilaterally and a narrowing of both joint spaces, but a greater narrowing on the medial aspect of both knees. (R. at 216.) However, he also noted a well-preserved patellofemoral joint space of the right knee. (R. at 216.) Buxton recommended aggressive physical therapy, an anti-inflammatory regimen, continued weight loss and physical activity. (R. at 217.) He also made a follow-up appointment with Meade in four weeks to reevaluate and consider steroid injections or synthetic joint lubricant usage. (R. at 217.) Buxton's report was reviewed by Dr. Neal A. Jewell, M.D. (R. at 217–18.)

Dr. Frank M. Johnson, M.D., a state agency physician completed a residual physical functional capacity assessment on March 25, 2004. (R. at 224–31.) Dr. Johnson reported a primary diagnosis of degenerative joint disease and a secondary diagnosis of osteoporosis, with other alleged impairments of diabetes, obesity, fatigue and depression. (R. at 224.) Dr. Johnson indicated that Meade had the residual functional capacity to perform light work diminished by a limited ability to push and/or pull with the lower extremities. (R. at 225.) Dr. Johnson indicated that Meade

---

[6] A Baker's cyst is the result of joint fluid building up in the joint capsule of the knee some and bulging out, typically in the back of the knee as a result of some underlying problem with the knee such as arthritis. *See* DORLAND'S, at 421.

-15-

could frequently balance and occasionally climb, stoop, kneel, crouch and crawl. (R. at 227.) He found no manipulative, visual, communicative or environmental limitations. (R. at 227–29.) Dr. Johnson found Meade's allegations partially credible. (R. at 226.) This assessment was affirmed by Dr. Robert O. McGuffin, M.D., another state agency physician, on July 13, 2004. (R. at 231.)

*B. Mental Health History*

Meade received mental health counseling from William B. Haynes Jr., M.Ed., a licensed professional counselor, and Dr. Sharad Sawant, M.D., of Life Recovery, L.L.C., from January 2003, to April 2004. (R. at 132–40, 219–22.) On January 29, 2003, Meade reported that she had sought treatment for depression in 1998, but took herself off of her medication and had not followed through. (R. at 139.) As a result, she not taken any antidepressants or anti-anxiety drugs in over two years. (R. at 140.) The symptoms of Meade's depression documented by Haynes were: tearfulness, poor sleeping, sadness, "demotivation," over-eating, weight gain, stomach complaints, thoughts of suicide, a family history of mental illness and family history of suicide. (R. at 139.) As a result, Haynes diagnosed Meade with major depression. (R. at 140.)

In addition to her depression symptoms, Meade discussed panic-like symptoms of heart palpitations, chest pain and diarrhea. (R. at 140.) On one occasion, Meade noted that these symptoms were severe enough to cause her to go to the emergency room because she thought that she was having a heart attack. (R. at 140, 208–14.)

Meade returned to Haynes on February 21, 2003, complaining of constant sickness and having difficulties at work. (R. at 138.) Haynes noted that Meade

-16-

needed to go on medication, begin an exercise program and return to church if she felt up to it. (R. at 138.) Her diagnosis of major depression continued. (R. at 138.)

Meade's depression symptoms continued on her visits of April 21, 2003, June 9, 2003, and June 30, 2003. (R. at 135–37.) She continued to complain of severe depression, fatigue, lethargy and exhaustion despite being on medication. (R. at 135–37.) On June 9, 2003, Meade reported that she was supposed to return to work after missing work due to kidney problems, but that she did not feel like she was able to concentrate enough to do her job. (R. at 136.) She also mentioned that she felt uncomfortable driving and that her medication was not working. (R. at 136.)

On November 17, 2003, Meade reported that her disability insurance payments were discontinued for her failure to follow through with counseling. (R. at 133.) She reported that she was evicted from her home and was living with a friend. (R. at 133.) Meade continued to complain of depression, thoughts of suicide and possible hallucinations were telling her that she was "no good" or would be "better off dead." (R. at 133.) Haynes discussed the possibility of hospitalization with Meade, but Meade wanted to wait a week to see how she felt before deciding. (R. at 133.) She was prescribed Lexapro and Effexor. (R. at 133.) On December 10, 2003, Haynes reported that Meade was not showing improvement with her symptoms and that she continued to be severely depressed. (R. at 132.) As a result, he referred her to a psychiatrist. (R. at 132.)

Meade saw Dr. Sharad Sawant, M.D., at Life Recovery, L.L.C., for two visits on February 19, 2004, and April 6, 2004. (R. at 219-22.) On February 19, 2004, Meade's chief complaint was that she needed medications for her depression. (R. at

220.) Meade indicated that her worst depression was in 1998, which she rated a 10 on a scale of one to 10, with 10 being the worst. (R. at 220.) She rated her depression at the time of the appointment as a six on a 10-point scale. (R. at 220.) Dr. Sawant noted that Meade was severely depressed and anxious, with paranoia and auditory hallucinations. (R. at 222.) As a result, he diagnosed Meade as having a severe major depressive disorder with psychotic features. (R. at 222.) However, Dr. Sawant noted that he would consider an alternative diagnosis of schizoaffective disorder. (R. at 222.) He also assessed Meade's global assessment of functioning, ("GAF"), score as 50.[7] (R. at 222.) Meade was prescribed Seroquel and Wellbutrin to accompany the Lexapro she was already taking, and she was advised to taper Effexor from her drug regimen. (R. at 222.)

At Meade's appointment with Dr. Sawant on April 6, 2004, she stated that she was "doing well" and her auditory hallucinations had decreased, but she continued to have crying spells and feelings of hopelessness. (R. at 219.) Dr. Sawant continued to diagnose Meade as having a severe major depressive disorder with psychotic features. (R. at 219.) She was prescribed Buspar for anxiety. (R. at 219.)

On April 27, 2004, Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Meade suffered from severe affective disorders which were not expected to last 12 months.

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41-50 indicates that an individual has [s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." DSM-IV, at 32.

(R. at 236–48.)  Leizer described Meade's affective disorder as depressive syndrome with sleep disturbances, decreased energy and hallucinations, delusions or paranoid thinking.  (R. at 239.)  Leizer indicated that Meade was moderately restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning, experience difficulties in maintaining concentration, persistence or pace and had experienced no episodes of decompensation of extended duration.  (R. at 246.)  This assessment was reviewed by R. J. Milan Jr., Ph.D., another state agency psychologist, on July 13, 2004.  (R. at 236.)  In Milan's review of Leizer's assessment, he changed the diagnosis on Meade's functional limitations and downgraded her difficulties in maintaining concentration, persistence or pace to moderate from marked.  (R. at 246.)

A Mental Residual Functional Capacity Assessment also was completed.  (R. at 232–35.)  From the record, it is unclear by whom or when this form was completed as it is not signed or dated.[8]  (R. at 232–35.)  This assessment indicated that Meade was moderately limited in her abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or

---

[8] Based on a comparison of the handwriting on this form and the PRTF, it appears that this form could also have been completed by state agency psychologist Leizer.  (R. at 232, 236.)

Case 2:06-cv-00008-GMW-PMS   Document 15   Filed 11/30/06   Page 19 of 32   Pageid#: 95

peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 232–33.) In all other categories, it was determined that Meade was not significantly limited. (R. at 232–33.)

On February 15, 2005, Kathy Miller, M.Ed., a licensed psychological examiner, and Robert Spangler, Ed.D., a licensed psychologist, evaluated Meade at the request of Disability Determination Services. (R. at 249–53.) Miller prepared a psychological report on February 16, 2005, based on their examination. (R. at 249.) This report noted that Meade seemed socially confident and comfortable; however, she had some awkwardness with gross motor movement due to her large size. (R. at 249.) Miller documented that Meade had erratic concentration, but that Meade was alert and oriented. (R. at 249, 251.) Miller noted that it was difficult to illicit a coherent history from Meade, and that Meade appeared to be a person of low average intelligence. (R. at 251.) However, Miller found that Meade's social skills were adequate, she related well with the examiner and she communicated in a clear, coherent manner. (R. at 252.) Furthermore, Meade was found to have the judgment necessary to handle her own financial affairs. (R. at 252.)

The Miller Forensic Assessment of Symptoms Test, ("M-FAST"), was administered to Meade to screen for malingered psychiatric illness. (R. at 252.) Meade received a total M-FAST score of 13 and a RC score of five, which, according to Miller, supported the clinical impression that Meade might have exaggerated her psychiatric symptoms. (R. at 252.) Meade was diagnosed with mild depression, not otherwise specified, low average intellectual functioning and moderate problems with concentration. (R. at 253.) Miller's report also indicated that Meade had a GAF of

60,[9] and that she appeared to be functioning at a baseline level. (R. at 253.)

Miller and Spangler also completed a medical assessment of Meade's ability to do work-related mental activities. (R. at 254–56.) It appears that although Miller assessed various limitations on Meade's work-related mental abilities, Spangler later noted that no limitations could be assessed give the M-FAST score which indicated malingering. (R. at 254-56.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the

---

[9] A GAF of 51-60 indicates that the individual has "[m]oderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." DSM-IV, at 32.

Case 2:06-cv-00008-GMW-PMS    Document 15    Filed 11/30/06    Page 21 of 32    Pageid#: 97

Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)–(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983); *Hall*, 658 F.2d at 264–65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 30, 2005, the ALJ found that Meade suffered from severe impairments, namely noninsulin dependant diabetes mellitus, obesity and mild degenerative changes in the knees. (R. at 16.) However, the ALJ found that Meade's impairments did not meet or equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14, 16.) The ALJ found that Meade's allegations of disabling pain and other symptoms were not credible and not supported by the documentary evidence. (R. at 16.) The ALJ found that Meade had the residual functional capacity to engage in light work. (R. at 16.) Therefore, the ALJ found that Meade was capable of performing her past relevant work as an assembler and a sewing machine operator. (R. at 16.) Thus, the ALJ found that Meade was not under a disability as defined in the Act and that she was not eligible for benefits. (R. at 16–17.) *See* 20 C.F.R. §§ 404.1520(e), 416.920(e) (2006).

The plaintiff argues that the ALJ's decision is not supported by substantial evidence. Specifically, Meade argues that the ALJ erred in failing to assign weight to the opinion of Dr. Sawant, a treating psychiatrist, in his determination that Meade did not have a severe mental impairment. (Memorandum In Support of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 13–20.) Meade also argues that the ALJ erred in determining her residual functional capacity by finding her able

to do light work and by rejecting the findings of Dr. Yousuf. (Plaintiff's Brief at 21–29.) Finally, Meade argues that the ALJ erred in failing to consider her diagnosed peripheral neuropathy in determining her residual functional capacity. (Plaintiff's Brief at 30.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he or she has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979).

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'

*Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)

-23-

(quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record support his findings.

### A. Asserted Error in ALJ's Consideration of Dr. Sawant

Meade's first argument is that the ALJ erred in failing to assign weight to the opinion of Dr. Sawant, her treating psychiatrist, and in finding that the plaintiff does not have a severe mental impairment. (Plaintiff's Brief at 13–20.) In fact, the ALJ hardly addressed Meade's alleged mental impairments, and the ALJ made no specific findings with respect to Meade's mental condition in the opinion's "FINDINGS" section. (R. at 16.) The ALJ stated, in the body of the opinion, that Meade did not have a severe mental impairment which would impose significant work restrictions that had lasted or was expected to last for 12 months. (R. at 15.) However, the ALJ simply stated this conclusion and insisted that it was supported by the opinion of Spangler and state agency medical sources. (R. at 15.)

The ALJ stated that Meade received treatment by psychologist Haynes during nine visits, and that during her last visit Meade reported to be "doing well." (R. at 14.) The record is inconsistent with these statements. The record indicates that Meade was seen seven times by Haynes and was seen two times by Dr. Sawant. (R. at 132–40, 219–22.) In fact, the ALJ never mentions Dr. Sawant, his diagnoses and the results

-24-

of his examinations.

While at her last examination by Dr. Sawant, on April 6, 2004, Meade did state that she was "doing well." (R. at 219.) This statement was incorrectly attributed by the ALJ to Haynes and was taken out of context. (R. at 14.) Meade indicated that she was doing better and experiencing fewer auditory hallucinations; however, she was also continuing to have crying spells and feelings of hopelessness. (R. at 219.) Despite this statement, Dr. Sawant continued to maintain his diagnosis that Meade was suffering from major depressive disorder with psychotic features. (R. at 219). Additionally, the mere presence of this statement in the ALJ's opinion does not indicate that the ALJ actually reviewed Dr. Sawant's records because this same statement was pulled out and recounted in the PRFT prepared by state agency psychologist Leizer and reviewed by state agency psychologist Milan. (R. at 248.)

Because Dr. Sawant was never mentioned in the ALJ's opinion, and because the one phrase from Dr. Sawant's report addressed by the ALJ was available in other records, there is no evidence that the ALJ examined the records of Dr. Sawant. There was no discussion of Dr. Sawant's assessments and diagnoses of Meade and no mention of his finding that Meade had a GAF score of 50, which indicates serious impairment. Instead, the ALJ simply adopted the statements of Kathy Miller, M.Ed.,[10] and Robert Spangler, Ed.D., without any examination of the probative evidence supplied by the records of Meade's treating physicians. Furthermore, the assessments by Miller and Spangler were internally inconsistent. They diagnosed Meade with a GAF score of 60, (R. at 14–15, 253.), indicating moderate symptoms. *See* DSM-IV,

---

[10] It also should be noted that the ALJ misstated the credentials of Miller by incorrectly referring to her as an M.D. instead of an M.Ed.

-25-

at 32. Despite a score of 60, which would indicate moderate symptoms, Miller and Spangler diagnosed Meade with mild depression. (R. at 14–15, 253.)

There was no discussion of the probative exhibits and evidence provided by the records of Dr. Sawant, and there was no effort made by the ALJ to explain what weight was given to this evidence. Therefore, "to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold*, 567 F.2d at 259 (quoting *Oppenheim*, 495 F.2d at 397). The ALJ failed to properly weigh the evidence and resolve the conflicts that arose between the records of Dr. Sawant and the records of Miller and Spangler. As a result, this case must be remanded for further review so that the evidence may be properly balanced.

### B. Asserted Error in ALJ's Determination of Meade's Residual Functional Capacity

Meade's second argument is that the ALJ erred in his determination that she had a residual functional capacity to perform light work by rejecting the findings of Dr. Yousuf, Meade's primary treating physician. (Plaintiff's Brief at 21–29.) Meade objects to the ALJ giving weight to nonexamining state agency physicians over Meade's treating physician without support of other evidence in the record. (Plaintiff's Brief at 23–24.)

If a treating source's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with other substantial evidence, it is given controlling weight. *See* 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2) (2006). The opinion of a nonexamining physician is not considered substantial evidence when it is contradicted by all of the other evidence in the record. *See Millner v. Schweiker*, 725 F.2d 243, 245 (4th Cir. 1984) (citing *Hall v. Harris*, 658 F.2d 260, 265-66 (4th Cir. 1981); *Hayes v. Gardner*, 376 F.2d 517, 521 (4th Cir. 1967)). Additionally, the Fourth Circuit has noted that "circuit precedent does not require a treating physician's testimony 'be given controlling weight;'" however, if the opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig v. Charter*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).

"[T]he testimony of a non-examining physician can be relied upon when it is consistent with the record." *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Furthermore, under 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2), an ALJ is not bound by the findings of any medical source on a claimant's residual functional capacity. Instead, the responsibility for determining a claimant's residual functional capacity rests with the ALJ, and the ALJ can determine the value to give to a medical source's opinions according to the factors listed in 20 C.F.R. §§ 404.1527(d), 416.927(d).

The ALJ, in making this determination, adopted the findings of the state agency examiners, including Dr. Johnson and Dr. McGuffin, as well as psychologist Spangler and the testimony of the agency's vocational expert, Cathy Sanders. (R. at 14–16.) There is substantial evidence to support the findings of the ALJ on Meade's residual functional capacity, and to support the weight given to the assessments of Meade's treating physician, Dr. Yousuf. The ALJ has a duty to weigh the evidence, and this duty has been met. *See Gordon*, 725 F.2d at 235. The ALJ discussed the diagnoses and assessments of Dr. Yousuf at great length. The ALJ also examined the reports of

-27-

the state agency physicians and other treating sources, concluding, after this examination, that the assessments of Dr. Yousuf were inconsistent with other evidence in the record. (R. at 15–16.)

Meade's primary physical complaints are described by Dr. Yousuf in her submission to the Social Security Administration. (R. at 206–07, 258–59.) In her statements, Dr. Yousuf stated that Meade could not stand for more than one-half of an hour at a time, that she could not walk for more than 10 to 15 minutes, that she could not sit for more than one-half of an hour and that she had debilitating pain in her legs and back. (R. at 206–07, 258–59.) Dr. Yousuf also stated that Meade would need to shift positions about every half-hour and that she would need to take an unscheduled break every hour for 15 to 20 minutes. (R. at 206, 258.) This evaluation cuts against the determinations of the state agency physicians, Dr. Johnson and Dr. McGuffin, who determined that Meade had a residual functional capacity to perform light work. (R. at 224–31.)

However, there is substantial evidence to support the ALJ's decision not to follow the determinations of Dr. Yousuf, the treating physician, in determining Meade's functional capacity. First of all, many of the statements of Dr. Yousuf appear to be based primarily on the symptoms described to her by Meade, not by any objective testing methods. In particular, the statements directly relating to Meade's functional capacity, such as how long she could stand or walk, appear to be taken directly from Meade's statements to Dr. Yousuf, not on the doctor's objective determination. In other words, the determinations appear to come from Meade's own conjecture of her symptoms and limitations, not from a medical evaluation of her residual functional abilities.

-28-

In fact, there is substantial evidence in the record that provides support for the notion that Meade had a higher residual functional capacity than her statements to her doctors would indicate. First, psychological examiners Miller and Spangler concluded that the results of the M-FAST examination given to Meade could support a conclusion that Meade might be exaggerating her symptoms. (R. at 252.) While these results are, by the examiners' own account, not conclusive that Meade was exaggerating her symptoms, they would provide support for that conclusion if other documentary evidence was provided. (R. at 252.) As a result, this, in combination with other evidence, led the ALJ to determine that Dr. Yousuf's conclusions were suspect based on Meade's exaggeration.

Other evidence that Meade was downplaying her actual residual functional capacity is apparent in the record and in the ALJ's opinion. For example, at Meade's hearing before the ALJ, the ALJ noted that Meade was not using her cane. (R. at 33.) Dr. Yousuf, in her submission to the Social Security Administration, stated that Meade required a cane to assist her with ambulation. (R. at 207, 259.) Despite Dr. Yousuf's statement that Meade required a cane, there was no such notation made at any time throughout her treatment records, or the treatment records of any of Meade's other treating physicians, that she needed to use a cane.

Additionally, the ALJ noted that when objective tests were conducted to determine the causes of Meade's physical problems, the x-rays and other examinations of her knees and legs showed only mild to moderate degenerative joint disease and minimal osteophyte formation with narrowing. (R. at 14.) The ALJ also stated that there was some crepitation in the knees and a Baker's cyst, but the decrease in strength in her right lower extremity was slight. (R. at 14.) The only problem ever documented

-29-

with Meade's back was some degenerative spurring in her lumbar spine, but she did not have any nerve root compression or stenosis. (R. at 14, 15.)

Furthermore, during her hearing before the ALJ, and in her disability filings with the Social Security Administration, Meade stated that most of the time she was able to function without assistance, including doing housework, going grocery shopping, cooking for herself, driving short distances, living alone, going to church, managing her finances, reading for a several hours a day, standing without assistance, walking without assistance, using her arms and using her hands. (R. at 14–15, 29–35, 42, 82–90, 98–99, 251.) The record of Meade's ability to undertake these activities, along with the other evidence in the record, led the ALJ to the reasonable conclusion that Meade's physical impairments were severe and would limit her to undertaking light work or sedentary work. However, Meade's actual activities indicate that she is not completely disabled, as the statements of Dr. Yousuf indicate. This conclusion is rational and based on substantial evidence in the record.

### C. Asserted Error in ALJ's Consideration of Meade's Neuropathy

Meade's final argument is that the ALJ erred by failing to consider her diagnosis of peripheral neuropathy in determining her functional capacity. (Plaintiff's Brief at 30.) Meade concedes that the ALJ did mention her diagnosis of peripheral neuropathy in his opinion, however, she believes that the ALJ did not properly consider this ailment in his determination of her residual functional capacity. (Plaintiff's Brief at 30.) In support of this argument, Meade notes that, in making a determination of residual functional capacity, the ALJ must consider and explain the combined effect of an individual's numerous impairments which, if taken separately, would not create

Case 2:06-cv-00008-GMW-PMS   Document 15   Filed 11/30/06   Page 30 of 32   Pageid#: 106

a disability. *See Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (citing *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) and *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir. 1985)). Meade's argument on this issue is without merit.

The ALJ has a duty to weigh the evidence, see *Gordon*, 725 F.2d at 235, and under 20 C.F.R. §§ 404.1527(d) and 416.927(d), the ALJ has the duty to determine the claimant's residual functional capacity. In this case, the ALJ specifically made a finding that Meade "has *combined* impairments which are severe . . . but she does not have an impairment or *combination* of impairments" that establish a disability under the applicable standards. (R. at 16.) (emphasis added). The ALJ specifically mentioned peripheral neuropathy in his opinion as one of Meade's ailments, and he questioned Meade about her neuropathy and its impact on her during the hearing. (R. at 27–28.) Therefore, because the ALJ did take the combination of Meade's impairments into consideration, and one of the ailments he specifically mentioned in his evaluation was neuropathy, the ALJ properly examined the combined impact of Meade's impairments and determined that they did not result in disability.

While the ALJ does not go into detail about the degree of her neuropathy, it appears that he did consider it along with her numerous other ailments in making his determination of Meade's residual functional capacity. The ALJ questioned Meade about her neuropathy, and she responded that she did not know the meaning or symptoms of neuropathy. (R. at 27.) The ALJ explained the symptoms of neuropathy as numbness and tingling; however, Meade did not respond that she experienced these symptoms. (R. at 28.) Instead, she responded that she experienced pain in her legs. (R. at 28.) It is unclear from the hearing transcript of Meade's statements if she is actually attributing her leg pain to neuropathy or if it is the result of her other various

problems.

Furthermore, it also should be noted that there were never any limitations placed on Meade's activity by her treating physicians as a result of her neuropathy. Therefore, there is nothing in the record to contradict the ALJ's finding that Meade did not have an impairment or combination of impairments resulting in a disability attributable to neuropathy. Based on the evidence provided in the record, there is sufficient evidence to support the ALJ's determination of Meade's residual functional capacity.

## V. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment is overruled and the plaintiff's motion for summary judgment is overruled. The plaintiff's motion for remand is sustained. The Commissioner's final decision is vacated and the case is remanded to the Commissioner for further administrative proceedings.

An appropriate order will be entered.

DATED: This *30th* day of November, 2006.

_____
THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:06-cv-00008-GMW-PMS   Document 15   Filed 11/30/06   Page 32 of 32   Pageid#: 108